***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Garner and the briefs and oral arguments before the Full Commission. The Full Commission also reviewed the deposition testimony of Dr. Randy Readling and Dr. John Rodenbough and the prior deposition testimony of Ms. Jean Hubbard that was taken on July 7, 1999. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence, the Full Commission reverses the Deputy Commissioner's denial of benefits and enters the following Opinion and Award.
 ***********
The parties stipulated to certain facts contained in their Pre-Trial Agreement which was submitted at the hearing before the Deputy Commissioner as follows:
 STIPULATIONS
1. The parties are subject to the Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and Charter Pines at the time of her alleged injury.
3. Liberty Mutual Insurance Company was the Carrier on the risk.
4. Plaintiff was employed as a registered nurse with the Charter Pines and had worked for the employer from November 1996 until February 10, 1998.
5. Plaintiff's average weekly wage was $560.00, which yields a compensation rate of $373.33 per week.
6. Charter Pines has denied this claim.
7. The parties stipulated to the submission of the medical records of plaintiff (Stipulated Exhibit 1).
8. Plaintiff introduced, over objection by the defendants, a statement from plaintiff (Plaintiff's Exhibit 1).
9. Plaintiff introduced, over objection by the defendants, a statement from Jay Laws dated February 6, 1998 (Plaintiff's Exhibit 2).
10. Defendants introduced, without objection, plaintiff's clinical competency orientation test dated November 6, 1996 (Defendants' Exhibit 1).
11. Defendant introduced, without objection, plaintiff's competency tests during her employment (Defendants' Exhibit 2).
12. The issues for hearing before the Deputy Commissioner were as follows:
 a. Whether plaintiff suffers from an occupational disease that arose out of and in the course and scope of her employment with Charter Pines.
 b. If so, to what benefits is plaintiff entitled to receive under the Act.
 ***********
Based on the credible evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 35 years old and had worked as a registered nurse at Charter since November 5, 1996. This was the first nursing position held by plaintiff since her graduation from nursing school.
2. As part of her duties as a Registered Nurse (RN), plaintiff was responsible for caring for adolescents and children with mental and psychiatric problems, including drug and alcohol abuse. All RN's had supervisory authority over the Mental Health Assistants (MHAs), and MHAs were required to take instruction from the RNs. Plaintiff was also responsible for the operation of the unit and was required to supervise the subordinate nursing staff, assure proper documentation of the patients, assure proper communications regarding the patient care and filling out some paperwork. Plaintiff was also responsible for programming, group activities, assisting doctors on making rounds, administering medications and evaluating patient care.
3. Each RN was required to tape a report about each patient and the patient's activities of the day and was also required to report any medication changes or treatment plan updates. Each RN was also required to participate in family sessions. The information thus gathered would be passed along to the RN on the next shift, including any unusual problems occurring that day.
4. Beginning in October, 1997, plaintiff was working as a Registered Nurse in the children/adolescent's unit of the hospital. During this time, the hospital was short staffed, and she was required to perform tasks in addition to her normal job duties. For example, plaintiff was required to handle janitorial duties, including changing the patients' bed linens, and was often asked to clock out, yet remain and continue to work. During this time, there were two MHAs, Jay Laws and Ann Cutts, working under her supervision who neglected their duties to the patients. As a result of their behavior, plaintiff compensated by doing more work and attempting to manage the patient care almost single-handedly.
5. On one occasion, Jay Laws yelled at plaintiff and threw documents at her in anger and in the presence of patients. The patients were clearly affected by Laws' behavior and voiced their concerns to the plaintiff. Jay Laws and Ann Cutts were involved in an extramarital affair, which affected their work at the hospital. At times, both Cutts and Laws neglected to take care of the patients because they were pursuing their personal relationship during work hours.
6. On or about February 5, 1998, after being instructed by plaintiff to perform a task, Laws refused and told plaintiff that he was not going to do as he had been instructed. Plaintiff told Laws that if he did not perform the job as instructed, she would have him sent home. Laws threatened plaintiff that if she did so, he would retaliate by telling the plaintiff's superiors that she had been sexually involved with other employees.
7. Plaintiff was frightened by Laws' behavior and sought the assistance of Jean Hubbard, Director of Nursing, and Rick Bridges, Director of Adolescent Services. However, neither Hubbard nor Bridges offered assistance to the plaintiff and both told her to handle it herself because they were late for a meeting. Laws continued to disrespect plaintiff's authority and ultimately was sent home by the Assistant Director of Nursing.
8. On or about February 6, 1998, Laws came to work on his day off and filed a written complaint against plaintiff, outlining explicit and graphic details of alleged sexual harassment. Hubbard told plaintiff about the allegations and had her transferred from the department. That same day Hubbard acknowledged receipt of plaintiff's written complaints about the improper conduct of Laws and Cutts and their improper care of the patients.
9. Thereafter, Hubbard questioned several employees, including doctors and nurses, within the hospital about the allegations of sexual harassment between plaintiff and Laws. During the course of her investigation Hubbard violated plaintiff's confidence as well as violating policies and procedures of the hospital.
10. The culmination of these events at Charter resulted in plaintiff's experiencing debilitating migraine headaches, for which she initially sought medical treatment from Dr. Lisa Mannix. Plaintiff had previously suffered from migraine headaches. On February 10, 1998, Dr. Mannix wrote plaintiff out of work because her migraines became overwhelming. Although Dr. Mannix continued to see plaintiff, she also referred her to Dr. Randy Readling, a psychiatrist, and Dr. John Rodenbough, a neuropsychologist.
11. Dr. Readling's testimony and medical records established:
 a) Plaintiff's initial visit was related to an event that had occurred at Charter Hospital, where plaintiff had been essentially assaulted verbally and physically by an individual she called "Jay". Plaintiff was distraught, tearful and significantly anxious and depressed, and was very fearful of her safety.
 b) Plaintiff's symptoms included depression, anxiety and panic attacks consistent with Posttraumatic Stress Disorder. She experienced significant trouble sleeping, loss of appetite and weight, tearfulness, incredible fear of leaving her home, and even feeling unsafe within her home. She experiences panic attacks when she was in crowds of people, to the degree of not being able to go to the grocery.
 c) The illness occurred after the incidents at Charter, not prior to, and was related to whatever had happened to plaintiff at Charter. Charter certainly was what caused plaintiff's illness.
 d) Plaintiff had a previous history of an abusive relationship; however she had functioned very well for years. Plaintiff had gone through nursing school; had supported herself and her children in the interim between her first divorce and second marriage and was functioning very well at Charter until this incident occurred.
 e) Many incidents occurred at Charter that caused stress to plaintiff, including plaintiff's concern about the safety of the children, improper staffing, and being instructed to clock out while still being required to continue working. Plaintiff received no support from supervisors, which caused her a great deal of stress.
 f) An incident involving the death of a child patient at Charter in March, 1998, impacted the plaintiff strongly because the plaintiff took it very personally. Plaintiff's best friend was a nurse who had been on the unit at the time of the child's death. Newspapers, numerous television stations/shows, including 60 minutes and the local news, ran stories about the death of the child at Charter, as well as the overall incompetence of Charter Staff members and inadequate care provided to Charter patients. Plaintiff felt that if she had voiced her concerns louder perhaps something would have changed to have prevented the death of the child.
 g) Plaintiff's reaction was typical of patients who suffer from PTSD.
 h) At the time of Dr. Readling's treatment plaintiff was not mentally fit to work as a nurse. She was incapable of doing any work in any occupation at that time.
 i) Readling has seen the plaintiff every week for the last three years and continues to approve therapy for her regularly.
 j) The position of RN working in a psychiatric facility like Charter was a stressful position.
 k) Plaintiff was exposed to an increased risk of developing stress or some type of symptom like stress as a result of her job at Charter.
 l) The exposure at Charter contributed to the diagnosis of PTSD and anxiety. Someone working as a nurse in a psychiatric hospital is exposed to a much higher degree of stress than the general public.
12. Dr. Rodenbough's testimony and medical records established:
 a) His initial consultation with plaintiff in March of 1998 was with regard to potential treatment for migraine headaches, related to stress plaintiff was experiencing regarding events at Charter Hospital.
 b) He diagnosed the plaintiff with posttraumatic stress disorder based on symptoms in conjunction with the events that occurred during her employment at Charter.
 c) The PTSD symptoms developed since the plaintiff began working as a nurse at Charter.
 d) Plaintiff was fearful of an individual at her job and had fear of bodily harm.
 e) Plaintiff expressed a lack of support that occurred around her employment in relationship to what was happening with ["Jay"] and the things that were happening at work.
 f) Plaintiff complained about interactions with Jay Laws regarding aggressive conflicts, including throwing objects at her. A letter that was produced by Laws regarding graphic sexual activity he contends occurred between both himself and the plaintiff; or other male employees and the plaintiff, was given to Jean Hubbard. Hubbard shared the details of those accusations with non-essential personnel. The reaction to the letter by the plaintiff's supervisors created a great deal of fear in plaintiff.
 g) A critical element essential for the diagnosis of PTSD is the patient's perception of whether their life is in danger of or either bodily harm or death. One of the variables that played a significant role in the diagnosis of PTSD was the supervisor's response to the situation at work.
 h) Plaintiff was transferred because of the sexual allegations of Laws, and the letter became semi-public knowledge with colleagues that plaintiff worked with. Physicians and other staff members were talking about the letter. This was very frightening to the plaintiff. She did not feel supported at work. Plaintiff felt she was being punished because of the letter. Plaintiff felt that the supervisors were treating her offensively, and it interfered with her chosen profession.
 i) Plaintiff meets the criterion for migraine headaches and agoraphobia; which is a part of PTSD. She also exhibits signs of anxiety and depression.
 j) Plaintiff received biofeedback and psychotherapy. The focus of the treatment is to help the plaintiff improve her situation. Plaintiff cannot work in any capacity at this time. Plaintiff is not likely to be able to work as an RN in future.
 k) Plaintiff is receiving treatment approximately once per week and currently still has posttraumatic stress disorder based upon the events that occurred while the plaintiff was working at Charter.
 l) Plaintiff does not currently have the capacity to go back to work as a nurse or in any other field. Being a nurse in Charter Pines was stressful to plaintiff.
13. Dr. James Carter's medical records established:
 a) Diagnoses from the assessment were (i) an adjustment disorder and depressed mood (ii) Mood disorder due to migraines with depressive features (iii) panic disorder with agoraphobia (iv) migraine unspecified (v) occupational problems other psychosocial and environmental problems
b) The patient has experienced anxiety and depression.
 c) Although Mrs. Smith-Price has made progress, there continues to be moderate depression with anxiety and a moderate degree of anhedonia, which are still so severe that they prevent the plaintiff from working at a another place of employment.
 d) The plaintiff's disorder is insufficiently stable for her to resume employment as a consequence of her poor concentration and crying spells and anhedonia. She could not do serial sevens due to poor concentration. The plaintiff's memory is intact but her concentration is less than adequate.
 e) Mrs. Smith-Price is incapable of working as a nurse even in another place of employment. She is beginning to show improvement but yet continues to have poor concentration episodes of crying spells and considerable mistrust of other. This was her first job assignment following nursing school and it seems that she may be questioning her choice of a career in nursing.
 f) There was a point in time when this patient should have been hospitalized. With hospitalization, closer observations and intensive intervention may have significantly shortened the period of acute illness.
 g) In regards to future employment, the plaintiff would have to continue treatment, and be provided with vocational rehabilitation assessment to determine her strengths and weaknesses, particularly in view of the fact that she is questioning at this point in time, if she can or should return to nursing. As it improves, her future vocational goals it will become clearer.
14. The testimony of Irene Adamson, a former supervisor at Charter, established:
 a) There were problems and conflicts with the supervisory staff at Charter; individuals were improperly trained, and there was a disregard for the standards set by the state.
 b) Plaintiff's nursing license could have been in jeopardy due to the lack of training of the plaintiff's subordinates. As an RN, plaintiff was responsible for the care (or lack of care) provided by subordinate employees.
 c) Adamson had been a supervisor at Charter, but quit working at Charter because its chaotic atmosphere affected her ability to perform her profession.
15. Plaintiff's experiences at the job while employed by Charter Pines caused her occupational diseases. These job experiences placed plaintiff at an increased risk for contracting these occupational diseases. Members of the public generally were not exposed to these job experiences. Testimony to the effect that the type of job that plaintiff had did not cause her occupational diseases is not a defense. Theparticular experiences of her particular work caused her occupational disease, not the mere fact that she was a registered nurse in a psychiatric hospital.
16. Plaintiff was still undergoing medical treatment for her compensable conditions as of the date of the hearing before the Deputy Commissioner. As of that date it was not known how long that treatment should be continued.
 ***********
Based on the foregoing Stipulations and Findings of Facts, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Occupational diseases are compensable under the North Carolina Workers' Compensation Act. N.C. Gen. Stat. § 97-53. Certain specific diseases are set forth under the Act, and others fall under the "catch all" provision of N.C. Gen. Stat. § 97-53(13) which states that "an occupational disease is any disease which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment."
2. The person claiming benefits under the Act has the burden of proving each and every element of compensability. Harvey v. Raleigh PoliceDept., 96 N.C. App. 28, 384 S.E.2d 549, cert. denied 326 N.C. 706,388 S.E.2d 454 (1989).
3. The North Carolina Supreme Court has held that the employee is required to prove that a particular occupational exposure: 1) significantly caused the disease or contributed to its development; and 2) exposed the employee to an increased risk of developing the disease compared to members of the general public. Rutledge v. Tultex Corp.,308 N.C. 85, 101, 301 S.E.2d 359 (1983). The Commission may deny a claim for compensation for the claimant's failure to establish any single element in the definition of any occupational disease. Hansel v. ShermanTextiles, 309 N.C. 44, 383 S.E.2d 101, 106 (1981). In determining whether the occupational exposure contributed, the Commission may consider the medical testimony and other factors such as the nature and extent of the worker's occupational exposures, the presence or absence of other non work-related exposures which could contribute to the development of the disease, and the development of the disease with reference to the worker's work history. Keel v. HV, Inc.107 N.C. App. 536, 421 S.E.2d 362 (1992).
4. A disease is "characteristic" of a profession when there is a recognizable link between the nature of the job and an increased risk of contraction of the disease in question. Booker v. Duke Medical Center,297 N.C. 458, 256 S.E.2d 189 (1979). "Peculiar to the occupation" means that the conditions of the employment (emphasis added) must result in a hazard which distinguished it in character from the general run of occupations and is in excess of attending employment in general. Kellerv. City of Wilmington Police Dept., 65 N.C. App. 675, 309 S.E.2d 543
(1983) cert. granted 310 N.C. 625, 315 S.W.2d 690 (1984).
5. Plaintiff's diagnosis of PTSD was a result of the conditions surrounding her job as a registered nurse. N.C. Gen. Stat. § 97-53
(13).
6. Plaintiff has established that her employment with the defendant significantly contributed to, or was a significant causal factor in the development of her PTSD and her other psychological problems. She has also established that her job put her at an increased risk of developing those conditions. N.C. Gen. Stat. § 97-53 (13).
7. Because of her occupational disease, plaintiff has not been able to earn wages since February 10, 1998. Her physicians do not know when, if ever, she will be capable of working again. Under these circumstances, she is entitled to continuing compensation until such time as she is able to return to work at the same or greater wages.
8. Defendants are responsible for medical care rendered as a result of her compensable condition, past, present and future. N.C. Gen. Stat. §§ 97-25 and 97-25.1.
 ***********
Based on the foregoing Findings of Facts and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to plaintiff compensation at the rate of $373.33 per week from February 10, 1998 to the present and continuing until she is able to return to work at the same or greater wages or until further order of the Industrial Commission. Such compensation as has accrued shall be paid in a lump sum, subject to 8 per cent interest and attorney fees as set forth below.
2. Defendants shall pay directly to plaintiff's attorney, and at the same time lump sum compensation is paid to plaintiff, 25% of the lump sum otherwise due to plaintiff pursuant to paragraph 1 of this Award. Thereafter defendants shall pay every fourth compensation check to plaintiff's attorney. These amounts are found to be reasonable attorney fees for plaintiff's counsel.
3. Defendants shall pay, in accordance with the Industrial Commission's medical fee schedule, all medical providers who have treated plaintiff with respect to her occupational disease as detailed in the Findings of Fact. Such treatment shall continue, and defendants shall pay for same, so long as such treatments are related to her compensable condition and tend to provide relief, provide a cure, or shorten the term of disability.
4. Defendants shall pay the costs.
This 28th day of March 2002.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
DISSENTING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER